IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KENNETH CAMPBELL, ET. AL, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | |
| | ) | **CIVIL ACTION NO. 1:99CV02979 (EGS)** |
| NATIONAL RAILROAD | ) | |
| PASSENGER CORPORATION, | ) | **CLASS ACTION** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**AMTRAK'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SANCTIONS**

**I.    INTRODUCTION**

Defendant National Railroad Passenger Corporation ("Amtrak"), through its undersigned counsel, hereby submits its memorandum in opposition to Plaintiffs' Motion for Sanctions. Relying on a series of mischaracterizations, material omissions and unsupported assumptions, Plaintiffs portray Amtrak as having engaged in discovery abuses crippling to Plaintiffs' ability to litigate this case. Plaintiffs' version of events, however, is untrue and incomplete; and *no* sanctions are warranted in this case, let alone the severe sanctions Plaintiffs seek.

Cutting through Plaintiffs' attempts to "muddy the waters" relevant to this motion, three issues lie at the heart of Plaintiffs' motion. First, Plaintiffs complain that Amtrak destroyed W-2 data requested by Plaintiffs and later ordered to be produced by this Court. However: (1) Plaintiffs' first request sufficient to put Amtrak on notice that W-2 data was sought was made in December 2004, more than two years after Amtrak responded to Plaintiffs' document request seeking electronic data; (2) no W-2 data was destroyed after December 2004; and (3) Amtrak's decision not to retain electronic W-2 data before December 2004 was made pursuant to the

1-WA/2587710.5

company's document retention policy and applicable IRS regulations at a time when Amtrak reasonably did not believe that Plaintiffs were seeking this information or that the information was relevant.

Second, Plaintiffs allege that Amtrak withheld or destroyed certain Affirmative Action Plan ("AAP") documents sought by Plaintiffs. For this, Plaintiffs rely solely on the deposition testimony of an Amtrak employee, Kevin Marshall, who first joined Amtrak in 2004. Plaintiffs selectively seized upon Mr. Marshall's admitted *speculation* that certain documents existed at Amtrak before his arrival. From this, and the fact that Amtrak's recent search for *additional* older AAP documents and/or adverse impact analyses located no more responsive documents, Plaintiffs leap to the unfounded conclusion that Amtrak must have systematically withheld or destroyed such documents. In fact, Amtrak has not produced additional documents because other than the nearly 20,000 pages of AAP-related documents, including workforce analysis documents, already produced by Amtrak, there are no additional AAP-related documents. There is, critically, *no evidence whatsoever* that Amtrak destroyed any pre-2004 AAP or adverse impact analysis documents. Plaintiffs, in fact, have gone so far as to falsely accuse Amtrak of destroying 2005 draft AAPs when such documents were actually produced and were in Plaintiffs' possession before the filing of the instant motion.

Third, Plaintiffs complain that Amtrak has failed to produce documents related to Office of Federal Contract Compliance Programs ("OFCCP") audits. Again, Plaintiffs mischaracterize and misreport Amtrak's actions in an attempt to create controversy where none otherwise exists. Despite Plaintiffs' allusion that Amtrak has not produced OFCCP audit documents, Amtrak produced more than 10,000 pages of such documents in 2002 and 2003, and, as Plaintiffs are

well aware, Amtrak was in the process of supplementing that production when Plaintiffs filed their sanctions motion.

Throughout this litigation, Amtrak has made every effort to ensure the preservation of relevant documents, to fully and completely respond to Plaintiffs' discovery requests, and to meet its discovery obligations.  These efforts have led to Amtrak's production of *over half a million* pages of documents in the five years of discovery in this case.  Plaintiffs' repeated references to the several instances in this case when the Court has ordered Amtrak to produce documents or a witness over an objection, or to other cases in which Amtrak was subject to a discovery sanction, are immaterial to the three issues relevant to this motion.[1]  Here, because there is no evidence of wrongdoing on Amtrak's part, including no evidence of the willful or intentional destruction or withholding of documents, sanctions are unwarranted.  Amtrak, therefore, respectfully requests that Plaintiffs' Motion for Sanctions be denied.

## II.    FACTUAL BACKGROUND

### A.    Amtrak's Production of W-2 Data

On June 4, 2001, Plaintiffs served a document request seeking:

Computer tapes containing any data base or computerized information relating to the work force within the defendant company during the time period of January 1, 1985 to present, which contains all or some of the following information:

    a.    name;
    b.    race;
    c.    social security number;
    d.    present and/or former address(es); . . .

---

[1] A substantial portion of Plaintiffs' argument in favor of sanctions in *this* case involves a discussion of other unrelated cases involving the imposition of sanctions upon Amtrak.  *See* Pltfs' Mot. at 27-28 (citing *Gibson v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 190 (E.D. Pa. 1997); *Pace v. Nat'l R.R. Passenger Corp.*, 291 F. Supp. 2d 93 (D. Conn. 2003); *Stanton v. Nat'l R.R. Passenger Corp.*,849 F. Supp. 1524, 1528 (M.D. Ala. 1994)).  These cases do not involve Plaintiffs, bear no relation to the claims in this case, and do not relate to the kinds of documents at issue in Plaintiffs' motion.  Thus, they are not in any way relevant to this case and do not speak to whether Amtrak satisfied its discovery obligations in this case.

l.      job initially hired into, including temporary, part-time, or full-time employment;

m.     whether the employee was hired as a temporary, part-time, or full-time employee;

n.      all jobs held with the defendant, including temporary, part-time, and fill-time employment, and the reason(s) for each job change;

o.      dates each job was held, including temporary, part-time, or full-time employment;

q.      wages and/or salary received, and rate of pay on each job held, including temporary, part-time, or full-time employment;

r.      hours worked on each job held, including temporary, part-time, or full-time employment;

In September 2002, Amtrak produced extensive electronic data in response to the above request and, since that time, has supplemented its production of electronic data.[2]  The electronic data produced by Amtrak includes responsive data from Amtrak's human resources databases, payroll databases, two separate discipline databases, and a training database.  The payroll data produced by Amtrak provides the most complete and detailed compensation information available regarding the Amtrak employees at issue in this lawsuit.  Likewise, the human resources data produced by Amtrak provides the most complete electronic information available regarding an employee's work history.

When Amtrak responded to the above document request, Amtrak understood Plaintiffs to be seeking Amtrak's electronic human resources and payroll databases.  As discussed below, Amtrak absolutely did not, however, understand Plaintiffs' request to encompass employees' W-2 information because Amtrak believed the W-2 data to be duplicative, and far less comprehensive than, Amtrak's electronic human resources and payroll data.  On **December 17, 2004**, more than two years after Amtrak produced electronic data in response to Plaintiffs' document request, Plaintiffs specifically requested W-2 data for the very first time.

---

[2] Amtrak first produced electronic data in September 2002 due to the significant difficulties in assembling and preparing 1990's Amtrak data, much of which was stored on tapes, for production.

Consistent with Amtrak's bona fide belief regarding the responsiveness of W-2 data to Plaintiffs' document requests, Amtrak objected to the production of the W-2 data on the grounds that such data was not relevant to Plaintiffs' claims in this lawsuit, and was merely duplicative of the payroll data already produced.  On April 29, 2005, Plaintiffs moved to compel the production of W-2 data.  Importantly, contrary to Plaintiffs' Motion for Sanctions, neither Amtrak's counsel nor members of Amtrak's law department were aware, during the time Plaintiffs' motion to compel was pending, that Amtrak had not maintained W-2 data for all years going back to 1990. Indeed, it was only *after* Amtrak was ordered by the Court to produce W-2 data that it was discovered that Amtrak, pursuant to its own document retention policy and consistent with applicable IRS regulations, only maintained W-2 data for a period of seven years.  (*See* Ex. A, November 30, 2005 Letter from R. Black to L. Kisch) (describing Amtrak's document retention policy and applicable IRS regulations).

Amtrak's seven-year document retention policy applicable to W-2 data goes over and above applicable IRS regulations, which require Amtrak to maintain such data for only a four year period.  (*See* 26 C.F.R. § 31.6001.1; IRS Employer's Tax Guide (Circular E)).  Pursuant to this policy, data tapes containing W-2 data for 1997 were erased in 2004, 1996 W-2 data were erased in 2003, and so forth.  Importantly, however, any erasure of W-2 data was conducted *before* December 17, 2004 when Plaintiffs first requested W-2 data and when, as a result, Amtrak was first put on notice of the need to retain such data.  The illustrative timeline below makes clear that no W-2 data was erased by Amtrak after December 2004.

**W-2 TIMELINE OF EVENTS**

| Deletion of W-2 Data | | Relevant Litigation Events | |
|---|---|---|---|
| **1999** | 1992 W-2 data erased | **November 9, 1999** | Plaintiffs file suit. |
| **2000** | 1993 W-2 data erased | | |
| **2001** | 1994 W-2 data erased | **June 4, 2001** | Plaintiffs serve data request understood by Amtrak to seek HR/payroll databases. |
| **2002** | 1995 W-2 data erased | **September 2002** | Amtrak produced electronic HR and payroll data in response to Plaintiffs' document request. |
| **2003** | 1996 W-2 data erased | | |
| **2004** | 1997 W-2 data erased | | |
| | | **December 17, 2004** | Plaintiffs first specifically request W-2 data. |
| | | **April 29, 2005** | Plaintiffs file motion to compel. |
| | | **September 9, 2005** | Court Orders production of W-2 data. |
| | | **Late September-October 2005** | Amtrak's Counsel and Amtrak's legal department learn for first time that pre-1998 electronic W-2 data erased pursuant to document retention policy/IRS regulations. |
| | | **November 9, 2005** | Amtrak produces W-2 data for 1998-2004. |

Pursuant to this Court's order, Amtrak has produced complete electronic W-2 data for the years 1998 through 2004 (and is in the process of supplementing this production to include 2005). Following its production of W-2 data, Amtrak also confirmed, and informed Plaintiffs' counsel that such data was directly derived from the payroll and other electronic data that Amtrak has already produced to Plaintiffs. (*See* Ex. B, January 10, 2006 Letter from R. Black to L. Kisch).

**B.** **Amtrak's Production of Affirmative Action Plan Documents and Adverse Impact Analyses**

**1.** **Pre-2004 AAP-Related Documents and Adverse Impact Analyses**

To date, Amtrak has produced nearly 20,000 pages of AAP-related documents, including workforce analyses and adverse impact analyses. Nonetheless, Plaintiffs claim that Amtrak has withheld or destroyed additional AAP-related documents and adverse impact analyses. The "support" Plaintiffs offer for this allegation is the incomplete and speculative deposition testimony of Kevin Marshall.

In October 2005, Amtrak designated Mr. Marshall as Amtrak's corporate representative to testify at a 30(b)(6) deposition regarding AAPs. At that time, Mr. Marshall had only been employed by Amtrak for one year. (*See* Deposition of Kevin Marshall ("Marshall Dep.") at 163 (attached hereto as Ex. C)). Nonetheless, Amtrak designated Mr. Marshall as its corporate representative because he was most knowledgeable of Amtrak's AAPs from the time of his arrival in 2004 through 2005, and because none of the individuals charged with directly assembling Amtrak's AAPs in the years prior to 2004 were still employed by Amtrak. It was expected that Mr. Marshall would attempt to learn facts in preparation for his deposition to allow him to testify about Amtrak's AAPs in the years before 2004. While Mr. Marshall was clearly knowledgeable about Amtrak's AAPs in 2004 and 2005, the deposition record reflects that Mr. Marshall was unable to garner sufficient knowledge to adequately testify about pre-2004 AAPs.[3]

---

[3] Plaintiffs' Motion for Sanctions alleges that Amtrak has unduly delayed in producing witnesses with knowledge regarding its AAPs. That, however, is untrue. Following Mr. Marshall's deposition, Amtrak agreed to produce an additional witness, Theodore Campbell, to testify about his knowledge of audits of Amtrak locations conducted by the Office of Federal Contract Compliance Programs. Amtrak has also agreed to produce additional witnesses with some knowledge of its pre-2004 AAP programs. However, Amtrak's counsel and Plaintiffs' counsel have discussed that any such additional depositions would take place after the completion of Mr. Campbell's deposition, which has not yet occurred (as discussed in more detail below).

Nonetheless, during his deposition, Mr. Marshall speculated that adverse impact analyses "had always been a part of conducting an affirmative action analysis" and that "thus, there should be years of such reports." (Marshall Dep. at 232). Based on this single statement, Plaintiffs have postulated that additional pre-2004 AAP-related documents, including workforce analyses and adverse impact analyses, must exist in addition to those contained within the thousands of pages of AAP documents already produced. Indeed, Plaintiffs accuse Amtrak of failing to produce such documents and even go so far as to accuse Amtrak of destroying them.

Plaintiffs, however, fail to acknowledge that upon further questioning, Mr. Marshall clarified his prior statement and stated that "I didn't see myself any adverse impact analysis between '95 up through when I started doing them." (*Id.* at 234). When he was later asked by Plaintiffs' counsel "do you know whether or not if an adverse impact analysis study or an affirmative action plan was conducted in a year, in fact, it was conducted in every year, '95 to the present?" he replied "I'm not sure." (*Id.* at 652-54).

Following Mr. Marshall's deposition, and at Plaintiffs' request, Amtrak produced additional AAP-related documents from the 2004-2005 period, including draft AAPs and adverse impact analyses about which Mr. Marshall testified. *See* Ex. D. After receiving these documents, Plaintiffs further requested that Amtrak produce any additional pre-2004 AAP-related documents, including any adverse impact analyses, dating back to 1990. Amtrak, despite having already searched for and produced thousands of pages of AAP-related documents, including adverse impact analyses and other workforce analyses contained within the AAPs already produced, undertook an additional, exhaustive search to locate any additional pre-2004 AAP-related documents or adverse impact analyses. That search did not locate any additional documents not already produced.

Plaintiffs' assumption that Mr. Marshall's testimony definitively established the existence of additional, unproduced AAP-related documents or adverse impact analyses is misplaced and unfounded.  In fact, Mr. Marshall admittedly lacked knowledge about whether any adverse impact analyses existed prior to 2004.  Moreover, those with superior knowledge than Mr. Marshall on the subject of whether adverse impact analyses were conducted prior to 2004 outside of what was contained in the already-produced AAPs, affirmatively do not recall the existence of any such documents.  (*See* Ex. E, Declaration of Gerri Mason Hall ("Hall Decl.") at ¶ 2).

Finally, it is true that, during 2006, Plaintiffs repeatedly asked Amtrak whether any such additional pre-2004 documents existed.  It is also true that Amtrak informed Plaintiffs that it was actively searching for any such additional documents.  However, the length of that search was not tied to any intent on Amtrak's part to delay production, but rather was the result of Amtrak's comprehensive effort to search for additional AAP-related documents or adverse impact analyses in every possible location across the country.  To date, all pre-2004 AAP-related documents and any adverse impact analyses that existed have been produced.

### 2.    2005 Draft AAPs and Adverse Impact Analyses

Plaintiffs further allege that Amtrak destroyed certain documents related to its 2005 AAPs.  Again, Plaintiffs rely upon, and distort, Mr. Marshall's deposition testimony, as well as blatantly mislead the Court regarding Amtrak's production of documents.  Though Plaintiffs represent to the Court that Mr. Marshall testified that he destroyed "draft Affirmative Action Plans," Plaintiffs omitted critical portions of Mr. Marshall's testimony.  The basis for Plaintiffs' complaint about the destruction of draft 2005 AAPs by Mr. Marshall is that "Changes made by Amtrak may have been significant."  (Pltfs' Mot. at 15).  However, Mr. Marshall testified that he

would have *retained* all 2005 draft AAPs and notations regarding such AAPs that contained any "significant notations."  Mr. Marshall testified, in relevant part:

> Q.  Do you know of any notes that you didn't keep that specifically, you know, would reflect the preparation of the affirmative action plans?
>
> A.  Not specifically.  But because we don't have the drafts – significant notations that we find significant enough to keep, if there's a change, we would have kept such a notation.  So I just don't remember.
>
> Q.  Okay.  So there wouldn't have been any significant notations on the draft plan.  Is that what you're saying?
>
> A.  That's correct.

(Marshall Dep. at 484-85).  In fact, contrary to Plaintiffs' allegations, draft 2005 AAPs *were retained by Amtrak and had been produced to Plaintiffs months before Plaintiffs filed their motion for sanctions*.[4]

Plaintiffs also attempt to impugn Amtrak's document retention efforts in this case by citing to testimony by Mr. Marshall that he did not learn of the existence of this litigation until "May or June, 2005."  (Pltfs' Mot. at 14).  Plaintiffs imply that Mr. Marshall was not provided any notice by Amtrak of the need to preserve documents relevant to this lawsuit, specifically the formal document retention memoranda previously provided to this Court for *in camera* review.  Mr. Marshall did not testify, however, that he failed to receive such memoranda.  In fact, Mr. Marshall was advised of the *Campbell* case, informed of Amtrak's document retention obligations regarding the *Campbell* case, and was provided with a document retention

---

[4] On March 7, 2006, Amtrak produced more than 3,000 pages of documents relating to 2005 and 2006 AAPs and any separate adverse impact analyses.  This production included draft 2005 AAPs for each of Amtrak's functional units (at AMK0000522093-AMK0000523302).  Thus, Plaintiffs' allegation that draft 2005 AAPs were not retained by Amtrak is false.

memorandum upon and after his arrival at Amtrak in February 2004. (*See* Ex. E, Hall Decl. at ¶ 3; Ex. F, Declaration of Melissa Rogers ("Rogers Decl.") at ¶¶ 2-4).

In February 2004, immediately upon his arrival at Amtrak, Mr. Marshall's direct supervisor, Gerri Mason-Hall, discussed the *Campbell* case with Mr. Marshall and specifically advised him of the need to preserve documents. (*See* Ex. E, Hall Decl. at ¶ 3). Moreover, in July 2004, another of Amtrak's document retention memoranda regarding the *Campbell* case was distributed to Amtrak managers via U.S. mail to the managers' home addresses, and again personally through the managers' direct supervisors. (Ex. F, Rogers Decl. at ¶2-4). Mr. Marshall was not only sent a copy of the memoranda at his home at that time but, a few weeks earlier, had been provided a copy of the memorandum by his direct supervisor. (*Id.* at ¶¶ 2-4; Ex. E, Hall Decl. at ¶ 3). Thus, Mr. Marshall's recollection during his deposition that he was not informed of this lawsuit until May/June 2005 was erroneous.

Mr. Marshall in fact affirmatively testified that he *was* notified of his obligation to keep "any records that may or even may not relate to affirmative action or whatever should not be destroyed unless determined okay to destroy by the law department." (Marshall Dep. at 489). He also testified that it was ***his understanding*** that draft plans were not encompassed within Amtrak's document retention memoranda. (*Id.*). Mr. Marshall did not cite to any specific Amtrak directive for this understanding, but relied upon his own interpretation of Amtrak's document retention notice and, to the extent that he destroyed any drafts of AAP-related documents, Mr. Marshall acted independent and outside of Amtrak's document retention directives.[5]

---

[5] Plaintiffs seize on Mr. Marshall's erroneous testimony that he was not informed of the existence of this litigation until May/June 2005 to further imply that Amtrak and its counsel have been disingenuous in making representations to the Court about its document retention efforts at the time of Plaintiffs' earlier preliminary injunction motion. (Pltfs' Mot. at 8-10, 14-15 & n.5). Such implications are false -- Amtrak clearly satisfied its obligations to notify

**C.**      **Amtrak's Production of OFCCP Audit Documents**

To date, Amtrak has produced more than 10,000 pages of documents relating to OFCCP audits. Those documents were produced in 2002 and 2003. Plaintiffs now complain that Amtrak has intentionally withheld additional OFCCP audit documents from production and has interfered with Plaintiffs' ability to depose an Amtrak witness, Theodore Campbell, on the topic of OFCCP audits. Neither of these assertions is true.

In November 2005, before the completion of the deposition of Mr. Marshall, Amtrak agreed to produce Mr. Campbell as a 30(b)(6) witness on the subject of OFCCP audits. Mr. Campbell's deposition was initially scheduled to take place in January 2006, but was postponed, by agreement of counsel, due to Mr. Campbell's sudden illness. The deposition was rescheduled to take place on April 11, 2006, the next available date for Mr. Campbell, Plaintiffs' counsel, and Amtrak's counsel. On April 10, 2006, in the course of preparing Mr. Campbell for his deposition, Amtrak's counsel discovered for the first time that Amtrak had not yet supplemented its production of OFCCP audit documents to include audits that took place after the last production of such documents in 2003.

In keeping with Amtrak's discovery obligations, and in an effort to prevent Plaintiffs' counsel from deposing Mr. Campbell without the benefit of all available OFCCP audit documents, Amtrak's counsel immediately informed Plaintiff's counsel of Amtrak's need to further supplement its production. Counsel agreed that Mr. Campbell's deposition would be postponed until Amtrak fully supplemented its production of OFCCP audit documents. To ensure that Amtrak had produced all available OFCCP audit documents in advance of Mr. Campbell's deposition, Amtrak has undertaken an extensive search each of its local human

---

Mr. Marshall and other relevant Amtrak managers of the need to retain potentially relevant documents. The issue of whether Mr. Marshall personally adhered to those directives is a separate issue.

resources offices.  That search resulted in the location of additional OFCCP audit documents that, as Plaintiffs' counsel was repeatedly informed before the filing of their sanctions motion, are in the possession of Amtrak's counsel and are being reviewed and prepared for production. Indeed, Amtrak located and provided the last group of these additional documents to counsel the day before plaintiffs filed their motion for sanctions.

### III.    ARGUMENT

Plaintiffs' Motion for Sanctions is premised upon mischaracterizations and speculation that certain documents are either being purposely concealed or withheld, or have been willfully destroyed.  With little to no evidence supporting their allegations, Plaintiffs seek to invoke extreme sanctions under the authority of Rule 37 to avoid their burden of proof and to effectively go straight to collecting attorneys' fees and damages without ever litigating their claims. However, as discussed in this memorandum, Amtrak has met its discovery obligations and has not engaged in any sanctionable conduct.  Without question, there is no evidence whatsoever that Amtrak willfully and/or intentionally destroyed or withheld relevant documents from Plaintiffs, or has unduly delayed in producing relevant documents.  Under these circumstances, sanctions of any sort, let alone the remarkably severe sanctions Plaintiffs seek, are unwarranted.

### A.    Amtrak Should Not Be Sanctioned For Its Failure To Predict Plaintiffs' Late Interest in W-2 Records That Are No Longer In Its Possession.

Plaintiffs seek to penalize Amtrak for not predicting their interest in duplicative W-2 data erased prior to the date on which Plaintiffs first specifically sought its production.  It is well established that a litigant is under no duty to retain every document in its possession once a complaint is filed.  Moreover, even if a relevant document is not preserved, its non-retention "must be a willful act, meaning deliberate obstructionist behavior" in order to be sanctionable. *Independent Petrochemical Corp. v. Aetna Casualty & Surety Co.*, 654 F. Supp. 1334, 1364

(D.D.C. 1986). Here, sanctions are not warranted because: (1) Amtrak did not reasonably believe that Plaintiffs' document request sought the production of W-2 data nor that W-2 data was relevant to Plaintiffs' claims, and (2) Amtrak did not willfully destroy W-2 data to avoid production or engage in obstructionist behavior.

### 1. Amtrak Reasonably Believed That W-2 Data Was Neither Requested by Plaintiffs Nor Relevant to Their Claims.

In response to Plaintiffs' Request for Production of Documents No. 4, Amtrak produced human resources and payroll data containing the most complete information available relating to compensation, positions held, work hours, and additional detailed information about Amtrak's employees of the sort requested by Plaintiffs. Because W-2 data was not nearly as comprehensive as the human resources and payroll data retained and produced by Amtrak, and, in fact, was duplicative and derived from the same data produced by Amtrak, Amtrak reasonably did not understand Plaintiffs' document request to seek W-2 data nor did it believe such data to be relevant to Plaintiffs' claims.[6]

The reasonableness of Amtrak's good faith belief that Plaintiffs were not seeking W-2 data is supported first by the lack of any compensation claims in Plaintiffs' Complaint. Amtrak had no reason to suspect that Plaintiffs sought W-2 data over and above the data Amtrak had produced particularly where no compensation claim was asserted. Moreover, though Plaintiffs' motion alludes several times to statements made by Amtrak in 2005 and 2006 that W-2 data might be relevant to the issue of damages, and argues that this fact alone should have been

---

[6] Amtrak confirmed to Plaintiffs counsel that annual W-2 data was derived directly from the payroll and HR data already produced and in Plaintiffs' possession. Plaintiffs' claims that the "annualized" W-2 data would somehow provide different information about putative class members is unfounded and appears to have been raised by Plaintiffs as an artificial basis for elevating Amtrak's failure to retain 1990-1997 W-2 data to the level of a controversy worthy of a sanctions motion. In any event, because the payroll and HR data plaintiffs possess is duplicative of, and in fact more complete than, the W-2 information they seek, Plaintiffs have not been prejudiced or injured as a result of the fact that 1990-1997 W-2 data is unavailable.

enough to require Amtrak to retain W-2 data, this argument is unavailing.  Because Amtrak believed that the payroll and human resources data produced to Plaintiffs was duplicative, but in fact far more comprehensive, than any W-2 data, it believed that it had already provided Plaintiffs with the most complete information available regarding potential damages.  Amtrak has simply observed, since the time Plaintiffs first specifically requested W-2 data in December 2004, that damages is the only issue that it believes W-2 data to be relevant to at all.  (*See* Ex. G, February 22, 2005 letter from R. Black to T. Fleming and L. Kisch).  Indeed, Amtrak informed Plaintiffs, in no uncertain terms, that it viewed the W-2 data sought is entirely duplicative of the data Amtrak already produced.

Amtrak's good faith belief is also supported by Plaintiffs' failure to notify Amtrak that they were seeking W-2 data until December 2004, more than two years after Amtrak produced electronic data in response to Plaintiffs' document request.  Between September 2002 and December 2004, the parties corresponded and conferred frequently regarding the production of electronic data – principally HR and payroll data.  At no time prior to December 2004 did Plaintiffs complain that Amtrak had failed to produce W-2 data, request that Amtrak do so, or clarify their document request to put Amtrak on notice that they intended to seek such data.  Indeed, in December 2003, approximately a year before Plaintiffs first suggested that W-2 data should be produced, a meeting of counsel and the parties' consulting experts was held to discuss Amtrak's data production -- at no time during that meeting did Plaintiffs' counsel suggest that W-2 data had been requested or was relevant to Plaintiffs' claims.

At bottom, Plaintiffs seek sanctions against Amtrak for acting in good faith and in conformity with its reasonable interpretation of the discovery request, its own document

retention policies,[7] and IRS regulations regarding the retention of W-2 data.  Amtrak cannot and should not be sanctioned for taking a "reasonable, defensive position" with regards to its interpretation of a discovery request.  *See Peterson v. Hantman*, No. 02-2552, 2005 U.S. Dist. LEXIS 4203, *17 (D.D.C. 2005) (holding that sanctions for failing to produce documents was inappropriate because Defendant's objections to its production was reasonable and justified).

### 2.    Amtrak Did Not Willfully Erase W-2 Data To Prevent Disclosure and Did Not Engage In Obstructionist Behavior.

Amtrak's admitted destruction of W-2 data was not done willfully to avoid production and Plaintiffs have not produced any evidence to suggest that it was.  That data was uncontrovertibly erased during a time when Amtrak reasonably believed it was *not* subject to discovery in this case.  It is also undisputed that no W-2 data was destroyed by Amtrak after Plaintiffs first put the company on notice of their desire to obtain W-2 data in December 2004.[8] Following the Court's Order in September 2005, Amtrak produced all W-2 data in its possession and subsequently informed Plaintiffs' counsel that prior years had been erased pursuant to its document retention policy and applicable IRS regulations.

---

[7] The inappropriateness of imposing sanctions on a party for the non-malicious destruction of documents in conformity with a company's retention policy is exemplified by a case involving a situation similar to the one at hand -- *Diersen v. Walker,* 2003 U.S. Dist. LEXIS 9538 (N.D. Ill. 2003).  In *Diersen*, the plaintiff sought the preclusion of evidence, adverse findings, or default judgment as sanctions for the defendant's failure to retain certain documents that, according to the plaintiff, were needed to support his discrimination and retaliation claims.  The defendant had discarded the documents in question in accordance with its formal five-year document retention policy.  Even recognizing that the defendant had a duty to preserve relevant evidence regardless of its retention policy, the Court held that sanctions were not warranted because the documents were not destroyed in bad faith or willfulness, and in accordance with the defendant's "record retention policy." *Id.* at *23-24 ("Absent bad faith destruction, the Court will not presume that the content of the destroyed documents were unfavorable to" the defendant); *see also Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir. 1985) (holding that where documents were destroyed under routine procedures and not in bad faith, the circumstances cannot sustain an adverse inference).  Moreover, the *Diersen* court, observing that subject documents were not the only proof available to demonstrate possible discrimination, found that the plaintiff was not prejudiced by the loss.

[8] As discussed above, Plaintiffs are incorrect in stating that Amtrak's counsel was aware at the time of Plaintiffs' Motion to Compel hearing on the W-2 data that data prior to 1998 no longer existed.  This fact was only discovered after Amtrak was ordered to produce W-2 data by the Court.  Thus, counsel made no material misrepresentations to the Court regarding the existence of W-2 data for the years 1990-1997 as alleged.

Amtrak did not purposely or willfully act to destroy the records to hinder the course of this litigation, the data was not lost out of a conscious disregard for its obligation to maintain relevant and responsive documents, and there is no evidence to the contrary. *See Shepherd v. American Broadcasting Cos. Inc.*, 62 F.3d 1469, 1481 (D.C. Cir. 1985) ("A sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so.").[9] Amtrak simply did not believe the W-2 data had been requested or was relevant to Plaintiffs' claims. Amtrak, therefore, should not be punished for the good faith destruction of W-2 data as a result of its reasonable belief that such information was not subject to a discovery request or relevant to the claims in this case.

### B.    Amtrak Should Not Be Sanctioned With Regard to the Production of AAP-Related Documents and Adverse Impact Analyses.

#### 1.    Amtrak Has Not Destroyed or Failed to Produce Pre-2004 AAP-Related Documents and Adverse Impact Analyses.

Amtrak has searched for and produced all AAP-related documents and adverse impact analyses that existed prior to 2004. Nonetheless, Plaintiffs speculate that additional documents exist and ask this Court to sanction Amtrak for the alleged destruction of, and failure to produce, those documents. The sole support for Plaintiffs' request is the deposition testimony of Kevin Marshall, an Amtrak manager who initially speculated during a deposition that adverse impact analyses may have existed for years prior to 2004, but later clarified his testimony to say that he

---

[9] In an attempt to alleviate their burden of proof on this motion, Plaintiffs rely on case law from an Oklahoma district court and an unpublished Tenth Circuit case to argue that they need not prove "willfulness or bad faith in order to obtain the sanctions requested." *See* Pls. Mot. for Sanctions at 25-26 (citing *Millsap v. McDonnell Douglas Corp.*, 162 F. Supp. 2d 1262, 1308 (N.D. Okla. 2001); *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv.*, 1998 WL 68879 (10th Cir. Feb. 20, 1998). These cases are not binding nor do they correctly represent the required standard of proof for imposing the types of extreme sanctions Plaintiffs seek for alleged discovery violations in this Court. Indeed, to prevail here, Plaintiffs must prove that Amtrak acted "willfully;" meaning "a conscious or intentional failure to act, as distinguished from an accidental or involuntary non-compliance." *Braxton v. Howard University*, 472 A.2d 1363, 1365 (D.C. 1984).

actually *did not know* whether such documents had ever actually existed.  This, without more, cannot support the imposition of sanctions against Amtrak.

Plaintiffs have presented *no evidence whatsoever* that Amtrak destroyed or has failed to produce any pre-2004 AAP-related documents or adverse impact analyses.  To the contrary, Amtrak has produced nearly 20,000 pages of AAP-related documents in discovery.  Those documents include, within the very AAPs themselves, workforce analyses that assess adverse impact.  In addition, even though Amtrak conducted an intensive search for all AAP-related documents before Kevin Marshall's deposition in late 2005, Amtrak conducted yet another intensive search for additional pre-2004 documents at Plaintiffs' request following that deposition and that additional search located no documents that had not already been produced. Finally, an Amtrak manager with knowledge of AAP-related documents prior to Mr. Marshall's arrival in 2004 time frame has confirmed that Mr. Marshall erred when he speculated that independent adverse impact analyses existed at Amtrak before 2004.  (Ex. E, Hall Decl. at ¶¶ 1-2). Rather, the only such analyses were contained in the AAPs that Amtrak has already searched for and produced.

Plaintiffs' reliance on Mr. Marshall's initial speculation about the existence of certain document before his arrival at Amtrak, and Plaintiffs' own assumption that such documents have been withheld or, worse, destroyed, are insufficient to support the imposition of sanctions.  *See Founding Church of Scientology, Inc. v. Director, FBI*, 104 F.R.D. 459, 463 (D.D.C. 1985) (denying motion to compel where Plaintiff offered nothing more than sheer conjecture and speculation to support its arguments that the information sought would likely lead to admissible evidence); *see also Visa Int'l Serv. Ass'n v. Bankcard Holders of America*, 784 F.2d 1472, 1475 (9th Cir. 1986) (noting, in the Rule 56(f) context, that discovery cannot be compelled "where it

was clear that the evidence sought was almost certainly nonexistent or was the object of pure speculation."). To prevail here, Plaintiffs must prove by clear and convincing evidence that documents Amtrak was required to retain were lost or destroyed, and that these actions were widespread and willful. *See Shepherd,* 62 F.3d at 1472 (severe sanctions cannot be imposed unless the Court finds by "by clear and convincing evidence –a preponderance is not sufficient – that abusive behavior occurred"). Absent evidence of willful destruction or any evidence that additional documents exist but have not been produced, Plaintiffs cannot prevail given the sanctions sought. Here, the evidence is directly to the contrary – far from destroying or withholding pre-2004 AAP-related and adverse impact analysis documents, Amtrak has twice searched for, and produced, all such documents. Amtrak cannot be sanctioned for failing to produce additional documents that simply do not exist. *See Cohn v. Taco Bell Corp.*, 1995 U.S. Dist. LEXIS 12645, *13 (N.D. Ill. 1995) (holding that a party cannot be forced to produce documents which do not exist).[10]

### 2.    Any Relevant Documents Destroyed By Mr. Marshall Were Destroyed Contrary to Directives He Received From Amtrak and, Even Then, Were Not Willfully Destroyed.

Amtrak acknowledges that Kevin Marshall testified that he may not have retained copies of draft 2005 AAPs, notations he may have made about those drafts, and draft adverse impact analyses related to the 2005 AAPs. However, to the extent that Mr. Marshall failed to retain any such documents, he did not do so at Amtrak's direction and Amtrak did not encourage, endorse

---

[10] In addition, it is well established that, in order to sanction a party for the alleged failure to produce documents pursuant to Fed. R. Civ. P. 37(b), the party must have been found to have violated a prior court order to produce those documents. *See Atkins v. Fischer*, 232 F.R.D. 116, 127 (D.D.C. 2005) ("in order to sanction a party pursuant to Rule 37(b)(2), the court must identify a specific discovery order that was actually violated.") (citing *Shepherd*, 62 F.3d 1469, 1470 (D.C. Cir. 1995)). Here, Plaintiffs have never sought to compel the production of AAP documents or OFCCP audit-related documents and Amtrak has violated no existing order requiring their production. Rather, in their zeal to rush to the Court in search of sanctions, Plaintiffs have skipped a crucial step in the Rule 37 process as to the alleged non-produced AAP-related and OFCCP audit-related documents – a motion to compel. On this ground alone, Plaintiffs motion for sanctions as to Amtrak's alleged non-production of these documents should be denied.

or approve of the non-retention of those documents. Though Plaintiffs attempt to impute responsibility for Mr. Marshall's actions to Amtrak by suggesting that the company failed to advise him of the existence of this litigation, and the need to retain relevant documents, until May or June of 2005, the record evidence demonstrates that Mr. Marshall *was* advised of the existence of this litigation, and of his document retention obligations, upon his arrival at Amtrak in 2004 (and well before he failed to retain the documents in question). Having taken all possible steps to ensure that Mr. Marshall retained relevant AAP-related documents, Amtrak should not be sanctioned for Mr. Marshall's individual failure to follow its clear directives.[11] *See Britt v. Block*, 636 F. Supp. 596, 605-607 (D. Vt. 1986) (holding that it was not appropriate to sanction a defendant employer in an employment discrimination case where a single employee, acting on the basis of her individual interpretation of the defendant's document retention obligations, independently engaged in the non-willful destruction of relevant documents, and noting that the "[d]estruction of records through misunderstanding or negligence is not sufficient to supply evidence or recast the burden of proof").

Of significant concern on the issue of Mr. Marshall's alleged failure to retain documents is the fact that Plaintiffs have materially misrepresented whether certain documents were actually retained by Mr. Marshall. In support of their motion, Plaintiffs represent to the Court that "Documents relating to [Amtrak's] 2005 Affirmative Action Plans were destroyed sometime after November 2004. The destroyed documents included draft Affirmative Action Plans . . ." (Pltfs' Mot. at 15). However, Plaintiffs ignore that, despite Mr. Marshall's testimony, he actually did retain, and Amtrak did produce, the draft 2005 AAPs in question. Indeed, more than a thousand pages of such drafts were produced to Plaintiffs months before they filed the instant

---

[11] Even if the Court were to find that Mr. Marshall's independent decision not to retain certain documents was the fault of Amtrak, sanctions for the non-retention of those documents are unwarranted because there is no evidence that Mr. Marshall acted willfully to destroy the documents and prevent their production.

motion.  At best, then, Plaintiffs failed to closely review the documents Amtrak has produced and are mistaken.  At worst, however, Plaintiffs have misled the Court in an attempt to bolster their allegations of document destruction.  In either case, Amtrak has already produced some of the very documents that Plaintiffs claim have been destroyed.

C.    **Amtrak Should Not Be Sanctioned For Its Delay In Supplementing The Production of OFCCP Audit Documents.**

Plaintiffs' suggestion that Amtrak has unduly delayed the production of, and withheld, OFCCP audit documents is false.  Amtrak has produced more than 10,000 OFCCP audit documents dating back to the early 1990s.  Indeed, the true crux of Plaintiffs' complaint is that Amtrak has not *supplemented* its production as quickly as Plaintiffs' desire.

As discussed above, Amtrak first produced OFCCP audit documents in 2002 and 2003.  Recently, in April 2006, Amtrak's counsel discovered that the production of OFCCP audit documents had not been supplemented since 2003.  Counsel, in an effort to ensure that Amtrak met its discovery obligations, immediately took action to ensure that Amtrak conducted a comprehensive search for additional OFCCP audit documents, including in all of Amtrak's human resources field offices – eight different offices covering the entire country.  This search began in mid-April 2006 and was still ongoing until just before Plaintiffs filed the instant motion due to the widespread geographic scope of the search.  Throughout the course of the search, Plaintiffs' counsel was repeatedly advised that the search was ongoing, that documents *had been located,* and that those documents would be reviewed and produced.  Nonetheless, Plaintiffs' counsel, apparently eager to add an additional issue to its sanctions motion, filed this motion before the located documents could be produced.

Amtrak is not evading its discovery obligations as to the OFCCP audit documents, but rather is attempting to fulfill them.  The fact that Amtrak continues to be alert to its discovery

obligations and continues to look for and produce additional documents demonstrates, rather than calls into question, its good faith. Amtrak has acted in compliance with Fed. R. Civ. P. 26(e), working to locate and produce any additional OFCCP audit documents. Rule 26(e) requires a party to supplement discovery responses as a case progresses and this is precisely what Amtrak is doing. Any delay in production has been caused by the thoroughness of Amtrak's search and its desire to fully comply with its discovery obligations. Plaintiffs' race to the Courthouse to impugn Amtrak and to seek sanctions should not be awarded and Plaintiffs' motion should be denied.

### D. Even If Amtrak Had Engaged In The Conduct Plaintiffs' Allege, The Sanctions Sought Are Too Extreme.

Sanctions are not warranted here because Amtrak did not engage in the conduct alleged and did not willfully destroy or withhold relevant documents as Plaintiffs suggest. However, even if the Court were to decide that Amtrak somehow failed to meet its discovery obligations, the sanctions sought by Plaintiffs in their motion are extreme and inappropriate. Plaintiffs' motion is a thinly disguised plea to this Court to resolve the merits of a complex employment discrimination class action case that has been actively litigated for close to seven years – a sanction tantamount to a default judgment given the importance of the Rule 23 class certification ruling to a class case such as this.[12] Such a severe sentence would not be warranted even if Plaintiffs' allegations were true.

Plaintiffs argue that the extreme, default-like sanctions they seek are warranted because "a district court need not impose the least onerous sanction." *See* Pltfs' Mot. at 29 (citing

---

[12] The D.C. Circuit has observed that legal authority regarding the imposition of default or dismissal-like discovery sanctions is applicable to cases in which a party seeks discovery sanctions so severe that they are tantamount to a litigation-ending sanctions. *See Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (finding that district court's sanction precluding the defense from introducing at trial was witnesses "approaches a default judgment in its severity").

*Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999)).  However, the Court of Appeals for the District of Columbia Circuit has repeatedly emphasized the extreme nature of default or dismissal as a litigation sanction: default or dismissal-like sanctions are a "drastic step, normally to be taken only after unfruitful resort to lesser sanctions."  *Shepherd*, 62 F.3d at 1478 (a sanction as extreme as default or dismissal is only appropriate where either a "destroyed document is dispositive of the case" or "where the guilty party has engaged in such wholesale destruction of primary evidence regarding a number of issues that the district court cannot fashion an effective issue-related sanction").  Indeed, "a district court may use its power to enter a sanction as severe as dismissal or default only if it finds, first, that there is clear and convincing evidence that the fraudulent or bad faith misconduct actually occurred, and second, that a lesser sanction 'would not sufficiently punish and deter the abusive conduct while allowing a full and fair trial on the merits.'"  *See Atkins,* 232 F.R.D. at 128 (citing *Shepherd*, 62 F.3d at 1472); *Morrison v. Int'l Programs Consortium*, 240 F. Supp. 2d 53, 56 (D. D.C. 2003) ("Default judgment . . . is a very severe sanction and is contrary to the judicial system's strong presumption in favor of adjudication on the merits.").

Moreover, the sanction of an adverse inference is generally not warranted when documents are lost or not retained, and certainly not absent a finding of willfulness or bad faith. *See Park v. City of Chicago*, 297 F.3d 606, 616 (7th Cir. 2002) ("An employer's destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse to the employer's case."); *see also Coates*, 756 F.2d at 551 (holding that where documents were destroyed under routine procedures, and not in bad faith, the circumstances cannot sustain an inference that the defendant's agent were "conscious of a weak case"); *Berkovich v. Hicks*, 922 F.2d 1018, 1024

(2nd Cir. 1991) ("The crucial element is not that evidence was destroyed but rather the reason for the destruction. . . .  One cannot justify the drawing of . . . an [adverse] inference where the destruction of evidence was unintentional.") (citing *INA Aviation Corp. v. United States*, 486 F. Supp. 695, 700 (E.D. N.Y. 1979)).

As the D.C. Circuit observed in *Shepherd*, a "district court must properly 'calibrate the scales' to ensure that the gravity of an inherent power sanction corresponds to the misconduct. The graver the sanction under consideration, the more precision this calibration requires." *Shepherd*, 62 F.3d at 1479; *see also Bonds,* 93 F.3d at 808 ("the choice of sanction should be guided by the concept of proportionality between offense and sanction.").  Particularly in the context of sanctions that would end or effectively end litigation, courts have insisted that "'since our system favors the disposition of cases on the merits, dismissal is a sanction of last resort to be applied only after less dire alternatives have been explored without success' or would obviously prove futile." *Shea*, 795 F.2d at 1075 (quoting *Trakas v. Quality Brands, Inc.*, 759 F.2d 185, 186-87 (D.C. Cir. 1985)); *see also Bonds*, 93 F.3d at 809 (the district court must consider less drastic sanctions before imposing a severe discovery sanction).  None of the sanctions Plaintiffs seek – monetary or otherwise – are proportional to the discovery violations alleged.

None of the documents or data that Plaintiffs claim has been withheld or destroyed are such that their absence prejudices, in any significant way, Plaintiffs' ability to establish the requirements of Rule 23 or, later, the merits of their claims.  The W-2 data, which merely provides an "annualized" version of the very same compensation information contained in the payroll data already provided to Plaintiffs, is duplicative of that payroll data; any draft AAPs and draft adverse impact analyses that Mr. Marshall failed to retain did not contain significant

notations and thus would have limited utility to Plaintiffs in proving their claims; and additional OFCCP documents are on the verge of being produced at a time when no deadline has yet been set for class certification briefing. Moreover, Plaintiffs have cited no case in which a party has been sanctioned in the manner requested here (as to the Rule 23 issues) and none appears to exist.

In sum, sanctions that would assume that Plaintiffs established all the necessary class certification requirements of Rule 23, impose adverse inferences on all major issues going to the merits of Plaintiffs' claims, and assume the accuracy of Plaintiffs' damages are tantamount to a default judgment regardless of how Plaintiffs seek to characterize their request for sanctions. These sanctions, as well as the enormous monetary penalty Plaintiffs seek, are not appropriate sanctions even if Plaintiffs could prove the truth of their discovery-related allegations. Here, because Amtrak simply has *not* engaged in the discovery abuses alleged by Plaintiffs, the sanctions sought are entirely unwarranted.

## IV.    CONCLUSION

For the reasons stated above, and well as the submissions and arguments of counsel, Defendant Amtrak respectfully requests that the Court deny Plaintiffs' Motion for Sanctions in its entirety.

Date:  June 27, 2006                         Respectfully submitted,


                                             _____/s/_____
                                             Grace E. Speights (D.C. Bar #392091)
                                             Richard W. Black (D.C. Bar # 467982)
                                             Morgan, Lewis & Bockius LLP
                                             1111 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20004
                                             (202) 739-3000

                                             Melissa Rogers, Esq. (D.C. Bar # 436189)
                                             National Railroad Passenger Corporation
                                             60 Massachusetts Avenue, N.E.
                                             Washington, D.C. 20002
                                             (202) 906-3191

                                             Attorneys for Defendant
                                             National Railroad Passenger Corporation

1-WA/2587710.5                         26